· [S. F. No. 6526. In Bank.—June 11, 1913.]

GEORGE C. W. EGAN, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), and MUSICAL ASSOCIATION OF SAN FRANCISCO (a Corporation), Respondents.

MUNICIPAL CORPORATIONS—LIMITATION ON POWERS.—Municipal corporations are public bodies of limited powers, and the validity of their acts must be judged by an examination of the charter or law defining their powers, rather than by a view of the purposes or results of those acts.

ID.—SAN FRANCISCO—OPERA HOUSE ERECTED ON CITY LAND—MANAGE-MENT CANNOT BE DELEGATED TO PRIVATE PERSONS—TITLE OF LAND REMAINING IN CITY—MINORITY REPRESENTATION OF CITY IN MANAGE-MENT.—The city and county of San Francisco has no authority to enter into an agreement with a private corporation for the erection

by the latter, on land belonging to the city, of a building to be used as an opera house, the entire control and management of which, together with such land, was to be turned over in perpetuity to a board composed for the main part, of persons whom the municipality has not selected and whose actions it cannot direct. This is so, notwithstanding under the terms of the agreement, the naked legal title of the land and building is to be vested in the city and county, and it is given a minority representation on the board of trustees which is, under the agreement, to have the possession and management of the opera house.

ID.—POWER OF CITY TO CONDUCT OPERA HOUSE.—Assuming that authority to erect and conduct an opera house may be conferred upon a city, the question whether a given municipality has that authority must be determined by a reference to the charter or law defining the powers of the particular municipality. Municipal corporations have only the powers expressly conferred and such as are necessarily incident to those expressly granted, or essential to the declared objects and purposes of the corporation.

ID.—SAN FRANCISCO HAS POWER TO CONDUCT OPERA HOUSE ERECTED ON CITY LAND.—Section 10 of chapter II, article II of the charter of the city and county of San Francisco, adopted on January 27, 1913, empowering the board of supervisors to acquire land within a certain district for the purpose of establishing a civic center, and providing that "it may authorize the erection of an auditorium by the Panama-Pacific International Exposition Company, or of an opera house, museum, or other structure, provided the ownership of such structure shall always be vested in the municipality," should not be construed as a grant of the right to erect only one of the various buildings described. That section constitutes an express grant to the supervisors of power to authorize the erection of an opera house to be owned by the city, and this carries with it, as a necessary incident, the power to use the building so owned for the purposes to which it is adapted.

ID.—POWER TO MANAGE OPERA HOUSE CANNOT BE DELEGATED.—Neither that section, nor any other provision of the charter of the city and county of San Francisco, authorizes the municipality, after acquiring the ownership of an opera house located upon land belonging to the city, to turn over in perpetuity to a private corporation, or to a body of private citizens, the absolute control and management of such land and building.

ID.—MANAGEMENT OF PROPERTY APPLIED TO PUBLIC PURPOSES CANNOT BE DELEGATED.—The charter of that municipality does not contain any clause authorizing it to delegate or part with its rights and duty of managing, through its own officers or agents thereunto authorized by law, city property applied to public purposes.

CLXV Cal.—37

ID.—CONDITIONAL GIFT TO MUNICIPALITY OF OPERA HOUSE—CITY CAN-
NOT GIVE LAND FOR SUCH PURPOSE.—Notwithstanding the city and
county, under article I, section 1, of its charter, may accept a gift
of an opera house, upon condition that its management shall be
for all time vested in a private body, that section does not authorize
it to turn over its land to be used, controlled, and managed by a
private body for the purposes of an opera house.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

H. S. Young, and John H. Riordan, *Amicus Curiae*, for
Appellant.

Percy V. Long, City Attorney, Thomas E. Haven and
Henry H. Hart, Assistant City Attorneys, for Respondent,
City and County of San Francisco.

Heller, Powers & Ehrman, for Respondent Musical Associa-
tion of San Francisco.

SLOSS, J.—The plaintiff, as a taxpayer of the city and
county of San Francisco, brought this action to enjoin the
carrying out of the terms of a certain agreement, entered into
between the city and county and the Musical Association of
San Francisco, and looking to the erection and management
of an opera house. He also sought to have the agreement,
and an ordinance authorizing its execution, declared null and
void. A demurrer to the complaint was sustained, and judg-
ment in favor of the defendants entered. The plaintiff ap-
peals from the judgment.

The agreement in question, briefly stated, after reciting the
incorporation of the Musical Association of San Francisco
(which we shall hereinafter designate as the "Association")
for the purpose of fostering and promoting the art of music,
and encouraging a taste therefor, and declaring the desirability
of these purposes, provides as follows: The association agrees
to build, erect, furnish and equip upon a described block of
land owned by the city and county, and forming a part of the
tract set apart as a Civic Center, an opera house, and to
expend in the construction, decoration, and equipment thereof

not less than seven hundred and fifty thousand dollars.  The
opera house, when completed, is to become a part of the
realty, and title to the land and building shall be vested in
perpetuity in said city, "but in trust for the uses, trusts and
purposes hereinafter set forth."  The building to be erected
is to be used exclusively for the production of operas, music
dramas, ballets, and concerts, and other musical and dramatic
purposes.  When not in use for these purposes, it may, for the
purpose of deriving a revenue to be applied to such pur-
poses, be rented by the trustees hereafter named.  The per-
petual use of the land and building, as above stated, shall
never be changed except by the consent of both parties to
the agreement.  The construction, decoration, furnishing, and
equipment of the opera house is to be under the direction,
control, and supervision and at the expense of the association,
but the exterior design is to be approved by the board of
supervisors of the city and county.  The city agrees, so far
as it has power so to do, that no taxes shall be assessed or
levied on the building or its contents, or upon the box, loge,
or seat privileges in the opera house.  The expense of park-
ing and gardening the grounds about the building is to be
borne by the city.

The 7th paragraph of the agreement provides that "the
occupation, conduct, control, management and possession of
said opera house and its contents shall be vested in perpetuity
in a board of fifteen trustees, or their respective successors, to
be constituted as follows": Nine trustees to be appointed from
the membership of the association by the board of governors,
one to be the mayor of the city and county of San Francisco,
one the head of the department of education of said city, one
a supervisor of the city and county appointed by the mayor,
one a citizen, not in public office, to be appointed by the
mayor, one a professor of the University of California, and
one a professor of Leland Stanford Jr. University, the two
last named to be appointed by the presidents of the respective
universities.  The following paragraph declares that "the
said trustees for all the purposes herein contemplated shall
be vested with the full control, possession and management
of the said opera house and its contents, and except as here-
inabove provided, of the land above particularly described.
. . ."  The trustees are authorized to lease the opera house

to companies, managers, or individuals for the purposes contemplated by the agreement; they are to have the sole right to direct and prescribe the quality of performances to be given, and the amount to be paid for admission, except that at least four hundred seats are to be reserved for sale to the public at a price not exceeding $1.50 per seat. The agreement contains a number of further provisions, but what we have set forth will sufficiently illustrate the principal points which are to be here considered.

In the final analysis, there is but one question to be decided, and that is, has the city and county of San Francisco, acting through its board of supervisors, the power to enter into an agreement like the one here attempted to be made. If the requisite authority is lacking, this court has, of course, no concern with the desirability of such an arrangement. No doubt the citizens who, by their subscriptions to the association, have made it possible for that body to undertake to erect, without cost to the city, a monumental structure, dedicated to the encouragement and advancement of artistic effort, are actuated by motives of altruism and civic pride rather than by any purpose of personal advantage. No doubt, too, the supervisors, in authorizing this contract, were impelled by the laudable desire to add to the attractions and benefits which the city has to offer to its inhabitants. But, however worthy the motive, however advantageous to the public the result sought to be attained, it must always be remembered that municipal corporations are public bodies of limited powers, and that the validity of their acts must be judged by an examination of the charter or law defining their powers, rather than by a view of the purposes or results of those acts. If the city and county has not the power to enter into such a contract as the one before us, that contract must fall, even though every member of this court should be convinced that the construction of an opera house on the agreed plan would be of the greatest benefit to the city and those residing within it. Notwithstanding the earnest and able arguments advanced on behalf of the respondents, we are unable to find any legal warrant for upholding the validity of the agreement. The effect of the transaction is, simply, that the city and county agrees with a private corporation that the latter may erect a building upon land belonging to the city, and that the entire

control and management of the land, with the building, are
to be turned over to a board composed, for the main part, of
persons whom the municipality has not selected and whose
actions it cannot direct.   It is true that, under the terms of
the agreement, the ownership of the land and building is to
be vested in the city and county.   But the beneficial attributes
of ownership, over and above the naked legal title, are taken
from the city and county, and are placed in the hands of
private persons.   The trustees have the "occupation, con-
duct, control, management and possession" of the opera house
in perpetuity; they are authorized to lease the premises, they
are to prescribe the performances to be given, and to regu-
late the prices to be charged for admission to the house.   In
short, they exercise virtually every right which could be exer-
cised by one holding under a perpetual lease which contained
no restriction except that the building was to be used only
for the purposes of an opera house.   And, as has been already
suggested, this exclusive control and possession, in the nature
of things as well as by the express terms of the agreement,
extends to the land to be covered by the building no less than
to the structure itself.

In endeavoring to ascertain whether the arrangement here
sought to be consummated is authorized, we need not con-
sider, at any length, the contention of appellant that the con-
struction and conducting of an opera house is not, under any
circumstances, a municipal function.   Even without relying
upon a specific provision of the San Francisco charter, to be
mentioned hereafter, we should hesitate to say that the pro-
viding of a place for the production of musical performances
was not within the proper scope of municipal activities, as
now understood.   The trend of authority, in more recent
years, has been in the direction of permitting municipalities
a wider range in undertaking to promote the public welfare
or enjoyment.   Thus, the appropriation of money for public
concerts has been held to be proper under a statute authoriz-
ing appropriations for armories, for the celebration of holi-
days, and for "other public purposes."   (*Hubbard* v. *Taun-
ton,* 140 Mass. 467, [5 N. E. 158].)   So, too, the erection of
an auditorium has been regarded as properly falling within
the purposes for which a municipal corporation may provide
by charter.   (*Denver* v. *Hallett,* 34 Colo. 393, [83 Pac. 1066].)

Similar views have been expressed in a case involving the levy of taxes for the purpose of building a hall to be used as a memorial to soldiers and sailors who served in the War of the Rebellion. (*Kingman* v. *Brockton,* 153 Mass. 255, [11 L. R. A. 123, 26 N. E. 998].) Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes. (*Hubbard* v. *Taunton,* 140 Mass. 467, [5 N. E. 158]; see *Spires* v. *Los Angeles,* 150 Cal. 64, [11 Ann. Cas. 465, 87 Pac. 1026]; *Laird* v. *Pittsburg,* 205 Pa. St. 1, [61 L. R. A. 332, 54 Atl. 324].)

Assuming, then, that authority to erect and conduct an opera house may be conferred upon a city, the question whether a given municipality has that authority must be answered by a reference to the charter or law defining the powers of the particular municipality. The rule is elementary that municipal corporations have only the powers expressly conferred and such as are necessarily incident to those expressly granted, or essential to the declared objects and purposes of the corporation. (Dillon on Municipal Corporations, 5th ed., sec. 357; *Von Schmidt* v. *Widber,* 105 Cal. 151, [38 Pac. 682]; *Gassner* v. *McCarthy,* 160 Cal. 82, [116 Pac. 73].) Whether or not the grant of powers contained in the charter of San Francisco, as originally adopted, is broad enough to authorize the city and county of San Francisco to conduct an opera house, it seems clear that the power to engage in such enterprise, at least under certain conditions, is necessarily implied from the language of section 10 of chapter II, article II, added to the charter by an amendment ratified by legislative resolution on January 27, 1913. The section, after empowering the board of supervisors to acquire land within a certain district for the purpose of establishing a civic center, and giving the board certain powers with respect to such land, provides that "it (the board of supervisors) may authorize the erection of an auditorium by the Panama-Pacific International Exposition Company, or of an opera house, museum, or other structure, provided the ownership of such structure shall always be vested in the municipality." We cannot agree with appellant's contention that the use of the alternative "or" limits the grant to that of the right to erect only one of the various buildings described. There is more

force, however, in the claim that the requirement that the building shall be erected by the Panama-Pacific International Exposition Company applies to all of the structures designated, and not merely to the auditorium. This question need not, however, be here resolved. Assuming that the section gives authority for the construction by others than the Exposition Company of an opera house, museum, or other structure of like kind (but not an auditorium), the provision constitutes an express grant to the supervisors of power to authorize the erection of an opera house to be owned by the city, and this carries with it, as a necessary incident, the power to use the building so owned for the purposes to which it is adapted.

But, granting that the city and county has the right to own and to conduct an opera house, has it the power, after acquiring the ownership of such structure located upon land belonging to the municipality, to turn over in perpetuity to a private corporation, or to a body of private citizens, the absolute control and management of such land and building? There is nothing in the amendment quoted above to indicate that it was designed to authorize the supervisors to provide for anything other than public structures and activities. On the contrary, the proviso that the ownership of the structure shall always be vested in the municipality shows clearly that it was intended to permit the construction of public buildings only. The charter does not here or elsewhere, so far as we have been able to discover, contain any clause authorizing the city to delegate or part with its right and duty of managing, through its own officers or agents thereunto authorized by law, city property applied to public purposes. It would certainly not be claimed that property devoted to the more familiar municipal purposes, such as policing, fire protection, or the assessment and collection of taxes, could be turned over to be administered by private agencies. How, then, can such action be justified in this case? The public use of public property cannot, under any provisions of charter or statute to which our attention has been directed, coexist with private management and control of such property. This principle is well illustrated by several decisions of this court. In *California Academy of Sciences* v. *San Francisco*, 107 Cal. 334, [40 Pac. 426], the board of supervisors, assuming to act under the

ordinance relating to the "outside lands," ratified by the legislature in 1868 (Stats. 1868, p. 379), set apart a lot "for the use of the Academy of Sciences," a private corporation organized for scientific research. The ordinance authorized the board to set apart lots "for public uses." It was held that the "Academy of Sciences," although its activities were beneficial to the public, was essentially a private, and not a public, corporation, and that land could not be set apart to it as for a "public use." A like conclusion was reached in *Home etc. of the Inebriate* v. *San Francisco,* 119 Cal. 534, [51 Pac. 950]. In each of these cases it was held that the plaintiff had no right to the possession of the land so sought to be set apart to it. Similarly, in *La Societa etc.* v. *San Francisco,* 131 Cal. 169, [53 L. R. A. 382, 63 Pac. 174], the court denied the power of the board of supervisors to grant a part of the city cemetery to a benevolent society for burial places, although the society agreed to and did expend money in improving the grounds, and buried a number of persons without charge. The essential ground of the decision, in the three cases just cited, was that a use by a private corporation was not a public use. For this reason the property of the city, held in trust for public uses, could not be turned over to such corporation. And the conclusion was not altered by the circumstance that the purposes to which the property was to be applied were, to some extent at least, within the scope of municipal activities. The same reasoning applies here. If the management of an opera house constitutes a public use, the public character of the use can exist only so long as the control is retained in the hands of some public agency. The powers of control vested in the board of trustees by the agreement before us undoubtedly require the exercise of judgment and discretion. Insofar as the proposed use is public, these powers necessarily devolve upon some officer or board of the municipality, and, under the well-settled rule, powers of this character cannot be delegated. (*Scollay* v. *County of Butte,* 67 Cal. 249, [7 Pac. 661]; *Holley* v. *Orange,* 106 Cal. 420, [39 Pac. 790]; *Knight* v. *Eureka,* 123 Cal. 192, [55 Pac. 768].)

There may, of course, be power to lease public property, but the agreement under consideration does not purport to be a lease, and besides, the proceedings requisite for the leasing of city lands (charter, art. II, chap. II, sec. 1, subd. 32) were

not followed.  It is suggested, in one of the briefs, that there
is no provision prohibiting the city and county from dis-
posing of its property.  But, in the case of a municipal cor-
poration, power to do an act is not to be implied from the
fact that the act is not expressly or impliedly prohibited.  As
we have already stated, the power does not exist, unless it is
granted in express terms or by necessary implication.

The objection now under discussion is not met by the con-
sideration that the city is given a representation on the board
of trustees which is, under the contract, to have the possession
and management of the opera house.  A majority of the
board is to be appointed by the Musical Association, and the
city is given no voice in the selection of such majority, or of
its successors.  It goes without saying that the association,
naming nine members of a board of fifteen, exercises a power
which cannot be effectively disputed by the city and county,
having a direct representation of not over four members.
Whatever might be said of an arrangement under which the
representation was equal (see *Laird* v. *Pittsburg,* 205 Pa. St. 1,
[61 L. R. A. 332, 54 Atl. 324]), it cannot be disputed that the
purpose and effect of the contract before us was to vest the
management and direction of the opera house in a board that
should be essentially beyond the control of the municipality
or its officers.

The respondents advance, as a distinct ground for sustain-
ing the transaction, the argument that the erection of the
opera house, under the terms of the agreement before us,
amounts to a gift to the municipality, in trust for purposes
germane to the objects of the corporation.  It is well settled
that municipal corporations may accept such gifts (*Estate of
Robinson,* 63 Cal. 620; *Worcester* v. *Eaton,* 13 Mass. 371, [7
Am. Dec. 155] ; *Jones* v. *Habersham,* 107 U. S. 174, [27 L. Ed.
401, 2 Sup. Ct. Rep. 336] ; *Phillips* v. *Harrow,* 93 Iowa, 92,
[61 N. W. 434]; *Beurhaus* v. *Cole,* 94 Wis. 617, [69 N. W.
986]), even where the gift is made subject to the perform-
ance of certain obligations by the municipality.  (*Budd* v.
*Budd,* 59 Fed. 735.)   Section 1 of article I of the San Fran-
cisco charter provides in terms that the city and county may
"receive bequests, gifts and donations of all kinds of prop-
erty, in fee simple, or in trust for charitable and other pur-
poses, and do all acts necessary to carry out the purposes

of said gifts, bequests and donations, with power to manage, sell, lease or otherwise dispose of the same, in accordance with the terms of the gift, bequest or trust.'' In so far as it is proposed to make a gift to the city, it is not to be doubted that the section quoted authorizes the city to accept the gift, in trust, and subject to the conditions agreed upon by the donors and the city. But the charter does not purport to authorize the city to make gifts, or to subject its property to a trust. The ''trust'' here sought to be created embraces not only the building to be erected by the association, but the land upon which that building is to stand. So long as the opera house is in existence, the land is withdrawn from any other use. It is as completely dedicated to the purposes of an opera house as is the structure standing upon it. Giving the fullest effect to the claim that the city may accept a gift of an opera house, upon condition that the management of 'that opera house shall be for all time vested in a private body, we cannot see how this argument tends to sustain the position that the city may turn over its land to be used, controlled and managed by such private body for the purposes of an opera house. If it were proposed to erect this building upon private property, and then to present the land and the building to the city, upon the conditions embodied in the agreement, the transaction might well be sustained upon the ground suggested by respondents. But the case before us is a very different one, and, however, much we may regret the result of our holding, we feel bound to declare that, in our judgment, there is no authority in law for the carrying out of the agreement here attacked.

The judgment is reversed.

Angellotti, J., Shaw, J., Lorigan, J., Melvin, J., and Henshaw, J., concurred.