[Civ. No. 3382. Second Appellate District, Division Two.—February 23, 1921.]

## COUNTY OF LOS ANGELES, Petitioner, v. JONATHAN S. DODGE, as Chairman of the Board of Supervisors, etc., Respondent.

[Civ. No. 3383. Second Appellate District, Division Two.—February 23, 1921.]

## THE CITY OF LOS ANGELES (a Municipal Corporation), Petitioner, v. MEREDITH P. SNYDER, as Mayor of the City of Los Angeles, Respondent.

[1] MUNICIPAL CORPORATIONS—MATTERS AFFECTING PUBLIC WELFARE—REVIEW OF ACTS OF CORPORATE OFFICERS.—When the legislature, or a board of supervisors or city council engaged in the exercise of legislative functions, proceeds upon the assumption that a matter concerning which it acts is one affecting the public interest or designed to promote the general welfare, the assumption is conclusive upon the courts unless it is plainly apparent to them that the view entertained by the legislative body is without just foundation.

[2] ID.—LOS ANGELES—ACQUISITION OF STADIUM—CHARTER.—The city of Los Angeles has the power under subdivision 4, section 2, article I, of its charter to construct and maintain a stadium.

APPLICATIONS for Writs of Mandate to compel the execution of a lease on behalf of a county and of a municipal corporation. Granted.

The facts are stated in the opinion of the court.

A. J. Hill, County Counsel, Edward T. Bishop, Assistant County Counsel, J. H. O'Connor, Deputy County Counsel, and Jess E. Stephens, for Petitioners.

O'Melveny, Millikin & Tuller, Sayre Macneil and John A. Powell for Respondents.

WORKS, J.—These proceedings were instituted to compel the respondent Dodge, as chairman of the board of supervisors of the county of Los Angeles, and the respondent Snyder, as mayor of the city of Los Angeles, to execute a certain lease on behalf, respectively, of the two bodies politic, the board of supervisors of the one and the city council of the other having ordered such execution, and the respondents having refused to obey the orders. The petitions in the two proceedings allege the same facts and the return in each is identical with that in the other. These returns are in the form of general demurrers to the petitions. The entire controversy may, therefore, be resolved from the faces of the petitions, and the two proceedings may be treated as one.

In addition to the county and the city, there are two organizations which find frequent mention in the petitions. One of these is the Sixth District Agricultural Association, "a public corporation of the State of California, to wit, an agricultural district." The other is the Community Development Association, "a nonprofit co-operative corporation duly organized and existing under and by virtue of the laws of the state of California, with the power and for the purpose of holding and maintaining industrial exhibitions, agricultural fairs, street pageants, athletic exhibitions and other performances designed to foster, promote and promulgate (*sic*) the industries and industrial welfare of the people of the state of California, and to lease and rent lands and construct buildings thereon for any or all of said purposes, and to lease out such buildings when constructed."

The agricultural association is the owner of Exposition Park, in the city of Los Angeles, but that ownership is charged with a trust, thus specified in the deed through which the association derives its title: "The said lands . . . shall be held in perpetuity as a place for holding agricultural exhibitions or fairs, and shall be managed and controlled by the association for that purpose; and also for

the purpose, so far as consistent therewith, of leasing or otherwise managing the same so as to raise a revenue for meeting the expenses of holding such exhibitions or fairs; and especially, so far as consistent with the above purposes, for the purpose of holding exhibitions of horses, cattle and other stock, and of the agricultural, horticultural, viticulturial, mechanical, manufacturing and domestic products'' of the sixth agricultural district.

On May 21, 1912, the agricultural association leased to the city a part of the land owned by it as above stated. There were two parcels covered by the lease, but one of them, however, designated as parcel B, being of interest in this controversy. Parcel B is appropriately described in general terms as the tract inclosed by the racecourse in Exposition Park, and it is the identical land proposed to be demised by the lease which it is the purpose of these proceedings to compel the respondents to execute. The city held an earlier lease to the land, dated February 23, 1910, and the lease of May 21, 1912, somewhat different in terms, supplanted the former instrument. The second lease was for a term of fifty years, running from the date of the first, with a right of renewal, on the part of the city, for a second fifty years. By the terms of the lease the city ''agrees to lay out and improve the parcel of land herein designated as Parcel B as and for a public playground and athletic field in accordance with plans prepared by the board of playground commissioners, or by such officer or board as may succeed to the powers and duties of said board of playground commissioners by law hereafter, subject however, to the approval of said plans'' by the agricultural association, ''and to provide the necessary apparatus for an athletic field and to keep and maintain the same for said purposes during the term of this lease.'' It was provided, in another part of the instrument, ''That said parcel of land herein designated as Parcel B shall be under the control and direction of the Board of Playground Commissioners of the city of Los Angeles or such officer or board as may succeed to the powers and duties of said board by law hereafter, and said board shall have the right to make and enforce such reasonable rules and regulations for the government of said athletic field or playground and said parcel of land shall be open at all times, except as herein otherwise

provided, for the use of the public." The exception mentioned in the last two lines of the quotation refers to certain reservations made in the lease in favor of the lessor, the nature of which it is not necessary to state. The lease also provided "That said parcels of land hereby demised shall at all reasonable times be open to the public as a place for exhibiting agricultural, horticultural and botanical products and for the recreation and enjoyment of all persons desiring to avail themselves of the opportunity therefor." The consideration paid by the city for the lease was the sum of $10,000, the receipt of which was, by the terms of the instrument, acknowledged by the agricultural association, and the agreement of the city to expend $100,000, within ten years, in improvements on parts of the demised property other than parcel B.

We now come to a statement of the terms of the instrument which it is sought to require the respondents to execute. The agricultural association, not being a party to the lease, has in writing consented to its execution and it already has been executed by the Community Development Association. That association, the city and the county are the prospective parties to the instrument. By the proposed convention between these parties, speaking in the present tense and not prospectively, the city leases parcel B to the development association, the "principal consideration" passing from the latter being the "erection and construction" of a certain stadium which is hereafter referred to with greater particularity, the leasehold interest, and the life of the instrument generally, to terminate February 23, 1960. It is to be noted, however, that, as will more fully appear below, the interest of the development association under the lease is to be, after ten years from its date, merely nominal.

By the terms of the instrument now under our inspection the development association agrees to construct, on parcel B, according to the plans of a certain architect, which plans are by reference made a part of the agreement, a stadium capable of seating 75,000 persons "suitable for exhibitions of productions hereinabove mentioned, including all manner of games, parades or other exhibitions in furtherance of the purposes hereinabove stated." By way of elucidation of the terms of this quotation it is to be stated that the "exhibitions . . . hereinabove mentioned," and the "purposes

hereinabove stated,'' appear in earlier portions of the lease in the following language: ''Agricultural exhibitions or fairs, . . . exhibitions of horses, cattle and other stock, and of agricultural, horticultural, viticultural, mechanical, manufacturing and domestic products,'' and ''industrial exhibitions, agricultural fairs, street pageants, athletic exhibitions and other performances designed to foster, promote and stimulate the industries and the industrial business and commercial welfare of the people of the state of California.''

The instrument further provides ''that for and in consideration of the right to use said stadium, its accessory buildings and grounds at the times . . . herein provided during each year of the term'' of the agreement, the city and the county will each pay to the development association $50,000 within six months after the commencement of the construction of the stadium, $62,000 within thirty days after its completion, $68,000 one year after the date of the last preceding payment, $65,000 two years after that date, $62,000 three years after that date, $59,000 four years after that date, $56,000 five years after that date, and $53,000 six years after that date, or the total sum of $475,000 from each of said bodies politic, being a grand total of $950,000 from the two together. It is further agreed that for a period of ten years from the date of the lease the city and the county will each pay to the development association, each year, a sum equal to the tax collected by it, the respective body politic, during such year.

It is further provided by the lease that during the first ten years of the life of the instrument the county ''may have the use, possession and enjoyment of said stadium and its accessory structures or buildings, or any part thereof, for public purposes not inconsistent with the purposes for which the said land is held in trust'' by the agricultural association, during a consecutive period, to be selected in a certain manner by the county, of fifteen days in the months of January, March, May, July, September, and November of each year; and the city is to enjoy a like and equal privilege, upon the same conditions, during February, April, June, August, October, and December of each year. After the expiration of the ten years the city and the county are each to use and enjoy the property half of the time, under a scheme of division provided by the convention.

During the ten-year period, except for the above-mentioned rights of the city and the county, the possession and use of the stadium are, of course, to be in the development association, and it may charge an admission fee for exhibitions and performances given under its auspices, but it agrees to maintain the property and keep it in good condition and repair during that period, and "all revenues derived by said association from the same during said period shall be applied by said association to the expense of maintenance of said structures and the accompanying grounds, and the remainder of said revenue shall be used in carrying out those purposes of the association" which are mentioned in the lease. In furtherance of this last clause it is provided that the association shall, during the ten-year period, render to each the city and the county, semi-annually, full and complete accounts of its financial operations, receipts and disbursements under the lease. After the expiration of the ten years the expense of the maintenance of the property is to be borne equally by the city and the county.

Another provision of the proposed lease is couched in these terms: "Said stadium and its accessory buildings, when constructed, shall be and become the property of said Association, and said Association shall have the title to the same, separate and apart from the land; that said Association shall have the right to withdraw from this agreement at any time after ten years from the date of its execution, upon written notice of its intention so to do delivered to each of the parties hereto thirty days prior to such termination, in which event the title to said stadium and its accessory buildings shall immediately vest in the said District, subject to all the other provisions of this agreement."

The proposed lease concludes with an agreement upon the part of the development association to vacate the demised premises at the expiration of the ten-year period and to deliver possession to the city and to the county, with provisions securing and protecting the two bodies politic in the event that the stadium is not constructed, and with a clause providing for the nonassignability of the instrument.

One of the objections made by the respondents to the proposed lease is that it cannot be authorized by the legislative bodies of the city and the county for the reason that the money proposed to be paid by them for the construc-

tion of the stadium would not be expended for a public purpose. We may premise a consideration of this question by the statement of a well-established rule bearing upon the sanctity surrounding action by the legislative department of government and the comparative freedom which that branch enjoys from interference by the judicial department, especially as that rule will be found to have a bearing upon other questions which we shall discuss below. The doctrine to which we refer has been stated in various ways in the many cases in which it has received the attention of the supreme court (three of which are *Stockton R. R. Co.* v. *City of Stockton,* 41 Cal. 147, 168, 175; *Daggett* v. *Colgan,* 92 Cal. 53, [27 Am. St. Rep. 95, 14 L. R. A. 474, 28 Pac. 51]; *Application of Miller,* 162 Cal. 687, 696, [124 Pac. 427]), and it may be restated, in language fitting to the present occasion, thus: [1] When the legislature, or a board of supervisors or city council engaged in the exercise of legislative functions, proceeds upon the assumption that a matter concerning which it acts is one affecting the public interest or designed to promote the general welfare, the assumption is conclusive upon the courts unless it is plainly apparent to them that the view entertained by the legislative body is without just foundation. Here, if we accord to them the honesty of purpose which must be conceded to them and the assumed existence of which largely supports the rule we have just stated, the board of supervisors and the city council, in ordering the execution of the proposed lease, proceeded upon the assumption that it is calculated favorably to influence the public welfare. Can we say that they were not justified in that view? [2] The respondents, in insisting that they were not, contend that, while the county is expressly authorized by law to acquire real property "for a courthouse, jail, hospital, art gallery, art institute, *stadium* and almshouse, public playground, public parks and other public purposes" (sec. 4041, subd. 6, Pol. Code), the city has not the power to enter into the field now proposed to be invaded. The respondents quote from the Los Angeles city charter (subd. 4, sec. 2, art. I) the provision to the effect that the city may acquire property for "libraries, reading-rooms, art galleries, museums, assembly or convention halls, schools, kindergartens, parks, playgrounds, gymnasiums, baths, . . ." etc., and that it may ac-

quire buildings and establishments "necessary or convenient for the transaction of public business or for promoting the health, morals, education or welfare of the inhabitants of the city or for their amusement, recreation, entertainment or benefit," and point to it as insufficient to authorize the acquisition of a stadium. Further, the respondents contend that no adjudicated case can be found which upholds an appropriation of public funds for the construction of a stadium, and, having in mind the trusts imposed upon parcel B by the deed under which the agricultural association holds title, as well as the broad purpose stated in the proposed lease, and commenting upon a definition of the word "stadium" as set forth in the brief of one of the petitioners, they say; "Certainly the idea of using stadiums for the purpose of holding agricultural exhibitions or livestock shows was foreign to the conception of the ancient Greeks and the attempt to attach such purposes to the use of the building contemplated by the lease agreement here involved requires a stretch of imagination and a straining of the reasonable construction of the terms used which it is unpleasant to contemplate." This reference to the Greeks is most unfortunate for the respondents' cause and is plainly made at random, not from an accurate reading of Grecian annals. It may be confounded by quotation from a standard history of Greece. After describing the stadium used for the Olympic games and after chronicling the rise of the Pythian, Nemean, and Isthmian games, all patterned upon the great original, Grote says, "The sacred games and festivals, here alluded to as a class, took hold of the Greek mind by so great a variety of feelings, as to counterbalance in a high degree the political disseverance, and to keep alive among their widespread cities, in the midst of constant jealously and frequent quarrel, a feeling of brotherhood and congenial sentiment such as must otherwise have died away. . . . Nor must we forget that the festival afforded opportunity for a sort of fair, including much traffic amid so large a class of spectators, and besides the exhibitions of the games themselves, there were recitations and lectures in a spacious council-room for those who chose to listen to them, by poets, rhapsodes, philosophers and historians,—among which last, the history of Herodotus is said to have been publicly read by its author. . . . Kylon,

whose unfortunate attempt to usurp the scepter at Athens has been recounted, had gained the prize in the Olympic stadium; Alexander, son of Amyntas, the prince of Macedon, had run for it. The great family of the Diagoridae at Rhodes, who furnished magistrates and generals to their native city, supplied a still greater number of successful boxers and pankratiasts at Olympia, while other instances occur of generals named by various cities from the lists of successful Olympic gymnasts; and the odes of Pindar, always dearly purchased, attest how many of the great and wealthy were found in that list.'' It is apparent from this passage that the Greeks used their stadiums in exactly the manner in which the one in contemplation by the city and the county is expected to be used by them, considering the difference between the ancient and the modern civilizations; and we have given space to the quotation because it is authority, in the present discussion, of equal value with the opinion of a court upon the subject, which, according to respondents, we must seek in vain. In connection with the striking recital of Grote and with the knowledge which all possess as to the form and character of a stadium and the general uses to which such a structure and the space it surrounds may be put, we may, however, quote with profit from *Egan* v. *City and County of San Francisco*, 165 Cal. 576, [Ann. Cas. 1915A, 754, 133 Pac. 294] : ''The trend of authority in more recent years has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment. . . . Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes.'' The board of supervisors and the city council were amply justified in indulging the assumption upon which we have said their approval of the lease was predicated. We have no doubt that the projected stadium is well designed as an instrument through which the trust imposed upon parcel B, as well as the purposes named in the proposed lease, may be discharged and effectuated, that its construction and maintenance will in an immense degree promote the public welfare, and that the power to construct and maintain it are well within the provisions of the charter.

In further pursuit of the contention that the city and the county propose to disburse the public funds for other than a public purpose, the respondents assert that, during the parts of the period of ten years following the date of the proposed lease when the stadium is not in the possession of the city or the county, the development association is privileged to derive a revenue from the property by making charge for admissions to exhibitions or performances held under its auspices. This point is effectually disposed of by the express terms of the lease itself. We have seen that the money resulting from the charge for admissions must be expended in the maintenance of the property and that such reports are to be made by the development association to the city and the county as will enable them to see to it that it is so expended. Under such circumstances neither the association nor its members may derive a profit from the use of the stadium. In this respect, also, then, the use of the public funds in the erection of the structure is not a use for a private purpose.

Another assault which the respondents make upon the contemplated lease agreement is that the county, under its terms, would acquire too intangible an interest in the stadium and in the land upon which it is to be erected to justify the proposed expenditure of county funds. This contention, although directed alone at the contemplated entry of the county into the arrangement, is based upon the idea that neither the city nor the county would obtain under the agreement more than an option or license to use the property. Respondents cite no authority in support of this contention, for the case of *Emerson* v. *Bergin,* 76 Cal. 197, [18 Pac. 264], mentioned in their brief, decides only that a license, in respect to real property, is "an authority to do a particular act, or series of acts, on another's land without possessing any estate therein," while the question here is whether, under the proposed lease, the county would acquire an estate or a tangible interest in parcel B and in the stadium proposed to be erected upon it.

Notwithstanding the failure of counsel to present authority in support of their position, it must be conceded that, at least upon a superficial examination, the situation presents some difficulties, in view of the fact that the city

and the county propose to expend the considerable sum of $950,000, one-half to come from each, in payment for the erection of a structure upon the land of the agricultural association, the ownership of the building to vest, in the final outcome, in that corporation. We propose, therefore, to analyze and consider the question made by the respondents with enough care to demonstrate that the difficulties mentioned are more apparent than real. It is evident that the prospective rights of the city and the county under the lease are quite different in fact, whether or not they are so in legal effect. The city already has, under the lease of 1912, an estate for years in the soil, subsisting until 1960, with a right to extend that estate for a further fifty years. Under the proposed lease the city and the county may each occupy and use the property, including the stadium, after it is completed, for one-fourth of the time during ten years from the date of the execution of the instrument, and for one-half of the time from thence forward until 1960. Thereafter, if the city exercises its option to renew under the lease of 1912, it may exclusively occupy and enjoy the property for an added fifty years. The right of the city under the proposed lease is, then, of more value and is of a higher quality than that of the county. The holder of an estate for years, it is probably at the same time landlord to the development association, although we need not be at pains to define, in exact terms, its relationship to that corporation, nor need we attempt to give a name to the rights to be enjoyed by the county. It might be a work of some nicety to characterize fittingly the respective situations of the parties under the proposed arrangement and it is not necessary for us to undertake the task. The lease agreement seems to be novel in form, and by that expression we do not adversely criticise it, for it is admirably conceived and admirably phrased. Whether or not it is to be regarded as creating the technical relationship of landlord and tenant between the city and the development association, or between the city and the county, or whether it makes each of the bodies politic but a tenant of the private corporation, for a time, in the stadium, it certainly creates clearly and definitely expressed contractual obligations between the parties. A very substantial consideration is to be paid by the city and the county for

what rights each is to enjoy and those rights cannot be misapprehended by a reader of the proposed agreement, nor can they be abridged nor taken away. No court can regard them lightly for they are fixed and determined in apt and accurate language.

We have already said that the rights of the city under the agreement are of more value and of greater quality than those of the county, but that is not to say that the county is not justified in expending as much money as the city under the arrangement. The city is already master of the situation under its lease of 1912. It has a thing of great value under the instrument. It has, in common parlance, something to sell to the county and it is these two who are to negotiate the terms of the sale. It is for the city to determine what consideration it will accept for the thing offered and it is for the county to determine whether it can justly pay the price demanded. Surely, the authorities we have noted early in this opinion (*Stockton R. R. Co.* v. *City of Stockton,* 41 Cal. 147, and the other cases cited with it), and the principle we have there stated, must have a direct application here. If a city council and a board of supervisors may determine what improvements are calculated to advance the public interest, subject to interference by the courts only when it is plainly apparent that such improvements are not so calculated, it must necessarily be true that they may determine what price shall be paid for these improvements, subject to no greater right in the courts to interfere. We cannot say that the county proposes to pay too great a price for the acquisition of the rights to be conferred upon it by the proposed lease and we are therefore bound to declare, upon the judgment of the board of supervisors, that what it is to get is worth what it proposes to pay.

The most determined objection made by respondents to the validity of the proposed lease agreement is that by its terms an attempt is made by the city to delegate to a private corporation, the development association, nondelegable public functions. Several lines of argument are addressed to this general question. It is first claimed that, under the original deed by which it holds, the agricultural association could not have leased to the development association, and that, therefore, the city, taking under the lease

of 1912 no greater rights than the agricultural association possessed, cannot lease to the development association. By an act approved April 17, 1909 (Stats. 1909, p. 982, sec. 7), the legislature empowered agricultural associations, among other things, to "sell, lease, beautify, improve and dispose of" real property "and do any and all acts and things necessary to carry out the objects and purposes for which said associations are formed." This language would seem to confer the power to lease to a private corporation and we do not understand that the respondents oppose this view. In fact, they refer to this statute as conferring a "general power" to lease. They do contend, however, that the authority thus given was removed by a statute approved five days later, April 22, 1909 (Stats. 1909, p. 1082). This latter act empowers an agricultural association "to lease lands owned, managed or controlled by said association, whether in trust or otherwise, not needed for the permanent use of said association, to any municipal corporation, county, or city and. county, in which said lands are located, for a period of not to exceed fifty years, for purposes not inconsistent with the objects and purposes for which 'said association is formed and for which said lands are held, owned or controlled by it." The enactment contains a provision to the effect that "all acts and parts of acts in conflict with this act are hereby repealed," and it is by means of this clause that the respondents contend that the power conferred by the act of April 17th was taken away, for they say that the act of April 22d does conflict with the earlier act. Considering, which is the fact, that the act of April 17th was one defining the territorial limits of the forty-five agricultural districts of the state, that it provided the machinery for the formation, organization, and powers of agricultural associations in the various districts, that it authorized the granting of financial aid by the state to the associations, and that it required an annual report from each association to the state board of agriculture, while the act of April 22d is devoted to the single purpose indicated by the quotation we have made from its provisions considering, also, the fact that the second act sprang into being but five days after the first, we should expect to find a plain and decisive inharmony between the respective provisions which are now in question before we could hold

that a conflict exists. We actually, however, perceive a contrary situation. Without reference to the considerations just mentioned and having regard alone to the subject matter of the two provisions which it is claimed are in conflict, it is apparent that the conflict is not present. The first act conferred a general leasing power. The legislature, evidently fearing that some doubt might exist as to whether agricultural associations could execute leases to cities, counties, or to a city and county under the general language of that act, passed the act of April 22d. The second act merely clarifies or supplements the first. We are convinced that the agricultural association could have leased directly to the development association.

Continuing their contention that the city proposes to delegate the performance of its public functions to a private corporation, the respondents call attention to the fact that the lease of 1912 demised parcel B to the city for use as a public playground and athletic field and for the holding of the various kinds of exhibitions mentioned in the instrument, and that the municipality bound itself thereby to keep the property open to the public at all times for those purposes and to operate and maintain it under the control of the board of playground commissioners. It is, upon this premise, insisted by the respondents that parcel B was by the lease dedicated to a specific public use, that the city is bound, under that dedication, to continue the land in that use, and that the proposed lease agreement amounts to an abrogation or violation of that duty. In support of their contention the respondents first cite section 119b of the city charter of Los Angeles, which is to the effect that property "set apart or dedicated for the use of the public as a public park or parks shall forever remain to the use of the public as such park or parks inviolate, and no part of said land or real property shall ever be used or occupied for any other purpose." It is apparent to us that this section does not support respondent's position. A playground and athletic field is not a park within the meaning of the prohibition enforced by the section. None of the many decisions throughout the country which we have discovered and in which the word "park" is defined, apply that designation to a public playground. A number of these decisions adopt the definition of the Century Dictionary to the effect

that "a park is a piece of ground set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as opportunity for open air recreation." With that definition we are satisfied and a public playground does not come within it. We are aware that it has been determined that the setting aside of a part of a park as a playground is not inconsistent with park purposes (*Caulfield* v. *Berwick*, 27 Cal. App. 493; [150 Pac. 646]), but that is far from saying that a playground is itself a public park. In fact, the case cited indicates the contrary, for it is to the effect, the italics being ours, that "the devotion of *a reasonable portion* of a public park to tennis courts, croquet grounds and children's playgrounds" comes within the uses for which public parks are created.

In further support of their contention that the city proposes, by the contemplated lease agreement, to delegate its public functions to a private corporation, respondents cite *City of Oakland* v. *Carpentier*, 13 Cal. 540, *Scollay* v. *County of Butte*, 67 Cal. 249, [7 Pac. 661], *Knight* v. *City of Eureka*, 123 Cal. 192, [55 Pac. 768], *Thompson* v. *Board of Trustees*, 144 Cal. 281, [77 Pac. 951], *Egan* v. *City and County of San Francisco*, 165 Cal. 576, [Ann. Cas. 1915A, 754, 133 Pac. 294], and *Galindo* v. *Walter*, 8 Cal. App. 234, [96 Pac. 505]. As these cases all announce a like principle and as respondents place great reliance on the latest of them, *Egan* v. *San Francisco*, our view that all are inapplicable to the present controversy may properly be presented by considering that one, as compared with other authorities which we shall cite and with the facts which are now before us. In the case relied on the municipality owned a block of land, being part of a tract which had been set apart as a civic center. The city had the power under its charter to erect and conduct an opera-house, but a private corporation agreed to expend $750,000 in the construction and equipment of such a building on the block in question, title to the structure to vest in the city and the building to be used for the production of operas and other musical and dramatic performances. The opera-house was to be managed and controlled in perpetuity by a board of trustees, composed of nine members, and these trustees were to prescribe the

quality of the performances to be given in the building and to fix the prices of admission to them. A citizen brought suit to enjoin the carrying out of the agreement and the supreme court determined that he was entitled to the relief demanded, upon the ground, in effect, which respondents invoke in opposition to the lease inveighed against in the present litigation. It is obvious from the above statement that the city of San Francisco, in the case cited, had attempted to barter away its public duty and responsibility, but is that case at all kindred to the present one? Note the difference between the two situations. Here, there is no final abdication of the functions of the city, if, in view of what we shall hereafter say, there can be said to be any abdication of its functions at all. It is true that the development association is to have the use of the property half the time for something less than ten years, as the period of construction, fixed by the lease agreement at a year and a half, with a right to extensions of time for cause, is to be deducted from the ten years; but the revenue to be derived from that use is to be expended for the maintenance of the property. The use of the property, without expense to either public treasury for maintenance, then, for nearly ten years, is to be enjoyed by the city and the county the remaining half of the time for that period, and for all the time thereafter until 1960, with the city's right of renewal under the lease of 1912 yet to be considered. Allowing to the members of the city council and of the board of supervisors the honesty of purpose which we must accord to them and the soundness of judgment which we must attribute to them, under authorities already twice mentioned in this opinion, we are bound to consider not only that the stadium is necessary to the needs of the people of the city and the county, but that the two bodies have adopted an available means for its procurement, unless their want of honesty or lack of judgment in those matters is apparent to us.

The rights secured to the development association by the proposed lease are temporary only and their comparatively brief exercise is to be followed by a long and beneficial use and enjoyment of the property by the city and the county. Except for the mere power to present and to superintend presentation of performances and exhibitions, the rights

of the development association are shadowy and unsubstantial, with the city and county at all times present and apparent as the substance behind the shadow. The development association is but the representative of the city and the county in the construction, in the maintenance and in the collection and disbursement of funds for the maintenance of the stadium. In its financial operations, under the system of reports provided for in the lease, it is subject to the rigid scrutiny and control of both bodies politic. Does this temporary interposition of the development association into the proposed enterprise, granted that the corporation may, during its intermittent and comparatively brief tenure, regulate the giving of performances and exhibitions; does that interposition, we say, bring the arrangement within the condemnation of the cases, including those cited by the respondents, which are undoubtedly and clearly to the general effect that a public entity cannot delegate the performance of its governmental duty or functions to a private agency? There are many decided cases which establish a rule of law not in opposition to that applied in *Egan* v. *San Francisco, supra,* and the other cases relied upon by respondents, but they are based in each instance upon a state of facts essentially different from that presented in those cases. To which of these different lines of facts is our present case most clearly akin? In *Worden* v. *City of New Bedford,* 131 Mass. 23, [41 Am. Rep. 185], the municipality had leased a room in its city hall to a private association for the holding of a poultry show, upon a compensation paid for the use of the room, including lighting and heating and the services of a janitor who was regularly in the employ of the city and under whose charge the city hall was. Through the negligence of the janitor a person who was apparently in attendance upon the poultry show was injured and suit was brought against the city to recover for the resulting damage. The court said: "The city could not erect buildings for business or speculative purposes, but having a city hall, built in good faith and used for municipal purposes, it has the right to allow it to be used incidentally for other purposes, either gratuitously or for a compensation." Upon this reasoning a verdict for the plaintiff was sustained. The supreme court of Wisconsin impliedly recognizes the power

of a municipality to lease park property for other purposes, if the use under the lease be not destructive of its use for park purposes. In passing upon such a lease it was said, in *Gilman* v. *City of Milwaukee,* 55 Wis. 328, [13 N. W. 266]: "It may be a question of fact whether such use is inconsistent with its use for a park, such use being to some extent public. If, however, as seems to be implied by the complaint, such use is entirely inconsistent with the use of these grounds for the purpose of a public park, and destructive of such use, then certainly such a diversion of the grounds is unlawful, and a lease for that purpose void." The rule we have in mind has also been applied by the supreme court of the United States. In *City of New Orleans* v. *Louisiana Construction Co.,* 140 U. S. 654, [35 L. Ed. 556, 11 Sup. Ct. Rep. 968, see, also, Rose's U. S. Notes], it appears that a certain tract of land along the Mississippi River had long been used as a public landing, the right to such use having been based upon a dedication of the land to the municipality. The city leased the property to a private individual for a term of twenty-five years and he erected certain structures upon it, which were used for the landing and storage of sugar and molasses, that having been the purpose to which the tract had been theretofore devoted. In passing upon the validity of the lease the court said: "The city has not undertaken to alienate or sell the ground under the sheds, but has only leased it for a term of years, reverting at the end of that time, with the sheds built thereon, to the city for the benefit of the public. The ground has no more ceased to be devoted to the public use by the making of the lease and the erection of the sheds, than if the city had itself built and managed the sheds for the promotion of commerce and the benefit of the city and its inhabitants." In *Bryant* v. *Logan,* 56 W. Va. 141, [3 Ann. Cas. 1011, 49 S. E. 21], a similar question was under review. The result of the opinion there rendered is thus expressed in the syllabus prepared by the court: "A lease for the term of one year, with a right to extend it five years, by a city, of a part of a public park, to improve it, and use it at times for training and running race horses, for a rental to the city, reserving access at times to the public for riding and driving on the track, is not an unlawful

diversion of such park from its legitimate use, and the lease is not void.'' Before turning to the decisions of our own state, we cite other cases as illustrating the doctrine upon which the foregoing quotations are based: *Little* v. *City of Holyoke,* 177 Mass. 114, [52 L. R. A. 417, 58 N. E. 170]; *Davis* v. *Inhabitants of Rockport,* 213 Mass. 279, [43 L. R. A. (N. S.) 1139, 100 N. E. .612]; *Dodge* v. *North End Improvement Assn.,* 189 Mich. 16, [Ann. Cas. 1918E, 485, 155 N. W. 438].

In *Harter* v. *City of San Jose,* 141 Cal. 659, [75 Pac. 344], the supreme court passed upon the validity of a lease by a city to a private individual of a portion of a public park for hotel purposes. After discussing the question whether there was an express authority in the city to make the lease, the court upheld the instrument upon the broad general principles underlying the decisions from other states to which we have referred in our discussion of this question. In *Egan* v. *San Francisco,* 165 Cal. 576, [Ann. Cas. 1915A, 754, 133 Pac. 294], which is relied on so strongly by respondents, the court, in connection with its refusal to uphold the agreement then in suit, says: ''There may, of course, be power to lease public property, but the agreement under consideration does not purport to be a lease.'' The petitioners and the respondents are in disagreement upon the question as to what is meant by this utterance. Without repeating their arguments upon that matter, we are confident that the expression had its use in a consideration of the principles illustrated and supported by the authorities we have above cited. Certainly, the part of the statement concerning the power to lease has ample foundation in those authorities and is well justified by them. We are convinced, as well, that the validity of the lease agreement now in question is firmly established by them and that they, instead of *Egan* v. *San Francisco,* in the main doctrine presented by it, and other cases like it, rule the point now under discussion. The line of cases upon which we rely, leading up to *Harter* v. *San Jose, supra,* and to the detached expression in *Egan* v. *San Francisco,* establish the rule that a city may lease property devoted to a public use for purposes not inconsistent with such use when there is no public need therefor, and that it may also lease such property for purposes which conduce to or aid in the

discharge of such public use. Under the line of cases which we have already referred to so often (*Stockton R. R. Co.* v. *City of Stockton,* 41 Cal. 147, and other cases cited with it), it is within the province of the city legislative body to determine that its property devoted to a public use is not needed for such use, either for a limited time or as to a part of its acreage, and to determine what purposes, to be administered by private agencies, will aid in the discharge of such use, and to make leases thereof accordingly. When that body has solved such a question the courts must be satisfied with the solution unless it is plainly apparent to them that it is unjustified. Such a condition is far from apparent to us in this instance and we now determine that the claim of the respondents that the city is about to delegate the performance of its public duty to a private agency is unfounded and unwarranted.

The demurrers to the petitions are overruled and a peremptory writ of mandate will issue in each of the proceedings, the one requiring the respondent chairman of the board of supervisors and the other the respondent mayor to execute the proposed lease agreement.

Finlayson, P. J., and Craig, J., concurred.

Petitions to have the causes heard in the supreme court, after judgment in the district court of appeal, were denied by the supreme court on April 23, 1921.

Shaw, J., Lawlor, J., Wilbur, J., and Lennon, J., concurred.

Angellotti, C. J., and Olney, J., voted for granting of petition.