MEYER *v.* CITY OF CLEVELAND ET AL.

(Decided January 27, 1930.)

*Mr. E. S. Byers* and *Mr. M. C. Harrison,* for plaintiff in error.

*Mr. Harold H. Burton,* director of law, *Mr. Henry S. Brainard* and *Mr. Carl F. Shuler,* for defendants in error.

*Messrs. Squire, Sanders & Dempsey* and *Mr. Robert F. Denison, amici curiae.*

WILLIAMS, J. On August 20, 1928, the council of the city of Cleveland passed a resolution declaring the necessity of constructing a "fireproof stadium on the lake front," and directed that the question of the issuance of bonds in the amount of $2,500,000 for that purpose be submitted to the voters at the election on November 6, 1928. At that election the voters, by a vote of 112,000 to 77,000, in round numbers, approved the proposition. The bonds were sold and the proceeds are in the treasury.

The city of Cleveland proposes to construct the stadium on the water front directly north of the new court house. The proposed stadium is to be a part of the "Group Plan" or "Mall Scheme" for the improvement of the city. On March 5, 1929, a contract was entered into with the Osborn Engineering Company for engineering and architectural services in connection with the building of the stadium, and on May 1, 1929, a contract was awarded to the Great Lakes Dredge & Dock Company for the construction of a bulkhead on the lake front as a part of the stadium project. On May 20, 1929, the plaintiff, Andrew A. Meyer, as a taxpayer on behalf of the city of Cleveland, filed his petition against the defendants, the city of Cleveland, William R. Hopkins, as city manager, and Adam J. Damm, as city treasurer, seeking to enjoin the construction of the stadium. Upon trial in the court below judgment was entered dismissing the petition. This proceeding in error is brought seeking a reversal of that judgment.

It will be observed that plaintiff has slept upon his rights for some time, permitting the proposal to be voted upon, and allowing considerable money to

be expended in the way of obtaining preliminary plans, and waiting until the city had obligated itself by the contract for the bulkhead, which is intended to prevent the bank of the lake from sliding out from the weight of the stadium when constructed. Equity aids the vigilant and not those who sleep upon their rights.

Plaintiff in error contends that the construction and maintenance of the stadium is not a lawful municipal purpose.

Cleveland is a charter city and it is not questioned by counsel that the municipality has power to create and maintain parks and to construct public buildings. In fact, the charter of the city of Cleveland gives the municipality power to plan, design and locate public buildings. The powers of a municipal corporation are not limited to providing for police, pavements, water, light, sewers, docks and markets, but it has been held that a municipality may minister to the comfort and health of its citizens, and may educate, instruct, please and amuse its inhabitants; maintain public libraries, parks and botanical and zoological gardens; provide exhibits for fair or exposition; construct memorial halls, monuments, statues; conduct public concerts; establish a public golf course, and construct and maintain any building calculated to promote education, recreation or pleasure of the public. The rule is thus stated in 19 Ruling Case Law, page 721, Section 29:

"Municipal corporations are not limited to providing for the material necessities of their citizens. Under legislative authority, they may minister to their comfort, health, pleasure, or education. They are not limited to policing the city, to paving the

streets, to providing it with light, water, sewers, docks, and markets. The power of cities and towns to maintain institutions which educate and instruct as well as please and amuse their inhabitants, such as libraries and botanical and zoological gardens, is unquestioned. So also the public funds may be expended in providing an exhibit at a fair or exposition. The reasonable use of public money for memorial halls, monuments, statues, gates or archways, celebrations, the publication of town histories, parks, roads leading to points of fine natural scenery, decorations upon public buildings, or other public ornaments or embellishments, designed merely to promote the general welfare, either by providing for fresh air or recreation, or by educating the public taste, or by inspiring sentiments of patriotism, or of respect for the memory of worthy individuals, has received such general sanctions that there can be no doubt that municipal corporations may be constitutionally authorized to expend money raised by taxation for such purposes. The trend of authority, in more recent years, has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment. Thus, the appropriation of money for public concerts has been held to be proper. So, too, the erection of an auditorium has been regarded as properly falling within the purposes for which a municipal corporation may provide. Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes, and on this ground it has even been held that authority to erect and con-

duct an opera house may be conferred upon a municipal corporation.''

This passage has been quoted with approval in the following cases: *Capen* v. *City of Portland*, 112 Or., 14, 228 P., 105, 35 A. L. R., 589; *City of Tombstone* v. *Macia*, 30 Ariz., 218, 245 P., 677, 46 A. L. R., 828.

The only case disclosed by research which bears upon the right of a municipality to construct and maintain a stadium is *County of Los Angeles* v. *Dodge*, 51 Cal. App., 492, 197 P., 403. In holding that the municipality had such power, the court, at page 500 of 51 Cal. App., 197 P., 403, 407, used this language:

''It is apparent from this passage that the Greeks used their stadiums in exactly the manner in which the one in contemplation by the city and the county is expected to be used by them, considering the difference between the ancient and the modern civilization; and we have given space to the quotation because it is authority, in the present discussion, of equal value with the opinion of a court upon the subject, which, according to respondents, we must seek in vain. In connection with the striking recital of Grote and with the knowledge which all possess as to the form and character of a stadium and the general uses to which such a structure and the space it surrounds may be put, we may, however, quote with profit from *Egan* v. *City and County of San Francisco*, 165 Cal., 576, Ann. Cas., 1915A, 754, 133 P., 294: 'The trend of authority in more recent years has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment. * * * Generally

speaking, anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes.' The board of supervisors and the city council were amply justified in indulging the assumption upon which we have said their approval of the lease was predicated. We have no doubt that the projected stadium is well designed as an instrument through which the trust imposed upon Parcel B, as well as the purposes named in the proposed lease, may be discharged and effectuated, that its construction and maintenance will in an immense degree promote the public welfare, and that the power to construct and maintain it are well within the provisions of the charter.''

Stadiums were constructed in Greece 600 years before the Christian era. Rome in the zenith of her power not only constructed the Coliseum at Rome, but caused similar structures to be erected and maintained in various large cities of the empire for the entertainment and edification of the public. In 1896 the stadium at Athens was placed in repair and the Olympian games were revived there. American athletes participated and won most of the prizes. Since then the erection and maintenance of stadiums in America has come into vogue, until now there are hundreds of them in many towns and cities of the United States. In fact, within the forty-eight states of the Union ninety-three municipal stadiums have been erected, or are in process of erection, to say nothing of private stadiums and those of colleges and universities. New York City has two municipal stadiums, one in Manhattan and the other in the Bronx. There are such, also, in Chicago, Philadel-

phia, San Francisco, Los Angeles and Baltimore, the most famous and noteworthy of these being Soldiers' Field in Grant Park, Chicago, with a seating capacity of about 100,000 people. It is strange that with the erection of so many stadiums by municipalities the only reported case brought to light by research in the instant case is the one growing out of the erection of the stadium in Los Angeles.

It has been uniformly held that a municipality has power to construct a public auditorium. *Adams v. City of Durham,* 189 N. C., 232, 126 S. E., 611; *Halbruegger v. City of St. Louis,* 302 Mo., 573, 262 S. W., 379; *State, ex rel. Manhattan Const. Co., v. Barnes, Mayor,* 22 Okl., 191, 97 P., 997; *State, ex rel. Herbrandson, v. Vesperman,* 52 N. D., 641, 204 N. W., 202; *Wilkerson v. City of Lexington,* 188 Ky., 381, 222 S. W., 74; *Heald v. City of Cleveland,* 19 N. P. (N. S.), 305, 27 O. D. (N. P.), 435.

It is difficult to see the difference, from a legal standpoint, between the erection of a stadium and erection of an auditorium, except that one provides for performances and gatherings within doors and the other outdoors. If an auditorium is designed to promote the education, amusement and inspiration of the public, we cannot see why an appropriate building erected for such purposes out of doors, where the assembled multitude may enjoy and breathe the fresh air, may not be more conducive to the public welfare than the auditorium, as it in addition promotes the public health. Evidence was offered in the course of the trial to show some sixty possible purposes for which a stadium could be used. Among them are historical pageants, patriotic celebrations, playground festivals, all-nations carnivals,

civic demonstrations, school pageants, mass dramas and dramatic and folk festivals, outdoor opera, band concerts, musical festivals, saengerfests, receptions to famous visitors, mass meetings, community Christmas celebrations, Americanization ceremonies, expositions, and baseball, football, boxing, wrestling, and other athletic contests. It is obvious these purposes promote the public welfare and afford recreation, entertainment and education to the public quite as much as those activities which may be carried on within a public auditorium.

We have no hesitancy in reaching the conclusion that the stadium is a public building within the power of a chartered municipality like Cleveland to construct and maintain.

It is contended by plaintiff in error that the real purpose in erecting this stadium is to provide a ball park for the Cleveland Baseball Club of the American League. It appears that no contract has been let to any one for the use of the stadium, and, of course, after the stadium is built, it can only be used in a lawful and proper manner. Whether it can be used for professional baseball we are not compelled to determine at this time, but public auditoriums and public assembly places owned by municipalities have commonly been let for a consideration for lawful purposes, and where buildings of that character are owned by the city there can certainly be no objection to the city deriving revenue therefrom.

Plaintiff in error contends that the municipality's title to the land in question is clouded for the reason that the municipality is obligated to convey it to certain railroads. It appears that in 1918 council

passed an ordinance which provided in substance that the city for a named consideration agreed to convey to the railroads or their nominees an interest in a part of the land upon which it is proposed to construct the stadium. Nearly twelve years have elapsed and the record does not disclose that the railroads have ever accepted the offer contained in the ordinance, or that any railroad has ever taken possession of the land in question or is now claiming any interest in the real estate involved. In fact, there is evidence tending to show that the railroads have abandoned all claim to the property. The court below was justified in holding that plaintiff was not entitled to an injunction by reason of a cloud upon the title to the premises in question.

We have examined the various questions made by plaintiff in error and do not find that any of the contentions are well-founded. This cause is here on error, and not on appeal, and the decision of the court below is sustained by sufficient evidence. Finding no prejudicial error apparent on the face of the record, the judgment is affirmed.

*Judgment affirmed.*

LLOYD and RICHARDS, JJ., concur.

Judges WILLIAMS, LLOYD and RICHARDS, of the Sixth Appellate District, sitting in place of Judges VICKERY, LEVINE and SULLIVAN, of the Eighth Appellate District.