Taft, J.,
 

 dissenting. Apparently the decision and opinion of the majority recognize that, if the words “public property used for a public purpose,” as found in Section 5351, General Code, were given their ordinary meaning, the tax exemptions sought in this case should be granted. There can be no other explanation of the requirement, found in four of the six paragraphs of the syllabus and emphasized throughout the opinion, that the property involved must be used “exclusively” for public purposes in order to be exempted
 
 *116
 
 from taxation. The word “exclusively” does not appear in Section 5351, one of the statutes under which tax exemption is sought.
 

 This raises the question as to what power the General Assembly now has to exempt property from taxation.
 

 In 1929, the people of Ohio adopted an amendment to Section 2 of Article XII of their Constitution. In
 
 State, ex rel. Struble,
 
 v.
 
 Davis et
 
 al.,
 
 Tax Comm.,
 
 132 Ohio St., 555, 9 N. E. (2d), 684, it was held by this court (paragraph one of the syllabus) that, by reason of this amendment, “the power of the General Assembly to determine the subjects and methods of taxation and exemption of personal property therefrom is limited only by Article I [the Bill of Rights] of the Constitution of the state:”
 

 The
 
 Davis case
 
 has been frequently cited with approval and followed by this court.
 

 The language of the amendment, relied upon by this court as effecting this change in the power of the General Assembly, reads:
 

 “* * * and
 
 without limiting
 
 the
 
 general power,
 
 subject to the provisions of Article I of this Constitution,
 
 to determine
 
 the
 
 subjects and methods of taxation or exemptions therefrom
 
 * * *.” (Emphasis added.)
 

 By the amendment, the foregoing language was inserted immediately before language which, in substance, was previously found in this section and which reads:
 

 “ * * * general laws may be passed to exempt burying grounds, public school houses, houses used exclusively for public worship, institutions used exclusively for charitable purposes, and public property used exclusively for any public purpose, but all such laws shall be’ subject to alteration or repeal * * *.”
 

 In giving the new language of this section, relied upon in reaching the decision in the
 
 Davis case,
 
 its or
 
 *117
 
 dinary meaning, it is apparent that the “exemptions” referred to are those resulting from “taxation.” No other reasonable meaning can be given to the word “therefrom.” It would be clearly unreasonable to say that “exemptions therefrom” meant exemptions from the subjects of taxation or from the methods of taxation or from both such subjects and methods. The words “exemptions therefrom” must mean exemptions from taxation. There is nothing to indicate that such words mean only exemptions from taxation of personal property.
 

 In some instances, where it has been suggested that the General Assembly does not have the same power and authority in determining exemptions from taxation of real property as it does in determining exemptions from taxation of personal property, reference has been made to some of the previous words of the amended section which read:
 

 “Land and improvements thereon shall be taxed by uniform rule according to value.”
 

 The significance of this reference has usually not been suggested. The sentence quoted does deal with a subject of taxation (land and improvements thereon) and a method of taxation (by uniform rule according to value), but says nothing about permitting or prohibiting exemptions from taxation.
 

 A careful reading of the syllabus and the opinion by Matthias, J., in
 
 State, ex rel. Struble,
 
 v.
 
 Davis, supra,
 
 indicates that this was the understanding of the court when that case was decided. It recognizes that, with regard to the subject of real property, the method of taxation was prescribed, but nothing is said as to the power to exempt real property from taxation. This was proper because that question, was not before the court.
 

 The absence of the word “all'” before the words “land and improvements thereon” in the amended
 
 *118
 
 Section 2 of Article XII is significant. The last-quoted sentence from the amended section replaced language which required that laws be passed “taxing by a uniform rule * * *
 
 all
 
 real and personal property according to its true value in money.” The presence of this word “all” in the section, as adopted in 1851, was given by this court as the reason why the General Assembly had no power to provide for exemptions from taxation not specifically authorized by the words of Section 2 of Article XII prior to the amendment adopted in 1929.
 
 Exchange Bank of Columbus
 
 v.
 
 Hines, Treas.,
 
 3 Ohio St., 1;
 
 City of Zanesville
 
 v.
 
 Richards, Aud.,
 
 5 Ohio St., 589, 592;
 
 Baker
 
 v.
 
 City of Cincinnati,
 
 11 Ohio St., 534, 540;
 
 Fields
 
 v.
 
 Commrs. of Highland County,
 
 36 Ohio St., 476, 481;
 
 Shotwell
 
 v.
 
 Moore,
 
 45 Ohio St., 632, 645, 16 N. E., 470;
 
 Lee, Treas.,
 
 v.
 
 Sturges,
 
 46 Ohio St., 153, 159, 19 N. E., 560, 2 L. R. A., 556;
 
 Carlisle
 
 v.
 
 Hetherington, 47
 
 Ohio St., 235, 249, 24 N. E., 488;
 
 Treasurer
 
 v.
 
 Bank, 47
 
 Ohio St., 503, 518, 25 N. E., 697, 10 L. R. A., 196;
 
 Ashley
 
 v.
 
 Ryan,
 
 49 Ohio St., 504, 524, 31 N. E., 721;
 
 Probasco, Exr.,
 
 v.
 
 Raine, Aud.,
 
 50 Ohio St., 378, 391, 34 N. E., 536;
 
 State, ex rel.,
 
 v.
 
 Ferris,
 
 53 Ohio St., 314, 332, 41 N. E., 579, 30 L. R. A., 218.
 

 It may be argued that the words, “general laws may be passed to exempt burying grounds, public school houses, houses used exclusively for public worship, institutions used exclusively for charitable purposes, and public property used exclusively for any public purpose,” justify implying an intention to limit the “general power” of the General Assembly to determine exemptions from taxation of real property. The obvious fallacy of this argument is that the sentence in which these words are found clearly and expressly states that these words are not to limit that general power.
 

 In support of this argument, it may be pointed out
 
 *119
 
 that burying grounds, public school houses and houses used for public worship are real estate. It must be admitted, however, that institutions may not necessarily be real property and it is obvious that public property is not confined to real property. If these words are to limit the general power, then, since they are not all applicable only to real property but may be applicable to personal property, that would require a decision that the General Assembly does not have the general power to determine exemptions from taxation of personal property.
 

 It has been stated that the primary purpose of the 1929 amendment was to permit the General Assembly to classify personal property for taxation. It does not follow that there may have been no other purpose or that the words used did not accomplish some other purpose.
 

 In this instance, the constitutional amendment was submitted to the people for consideration by joint resolution of the General Assembly. There were, therefore, no debates of a constitutional convention or any “arguments and explanations” for or against its adoption (Section 1
 
 g,
 
 Article II of the Constitution). The joint resolution, submitting the proposed amendment to the electors for approval or rejection, contains nothing which might be helpful on this problem, except that the form of ballot prescribed stated the purpose of the proposed amendment to be “to provide for a more flexible system of taxation for the state and to protect property against excessive taxation according to value.” Certainly, removal of all limitations on the power of the General Assembly, with respect to exemptions from taxation, would tend to provide for a more flexible system of taxation.
 

 In the majority opinion, it is stated that, by reason of Section 20 of Article I of the Constitution, the right to determine exemptions remains with the people.
 
 *120
 
 This disregards the fact that, by Section 1 of Article II of the Constitution, the people delegated the “legislative power of the state” to the General Assembly. As recognized in
 
 State, ex rel. Struble,
 
 v.
 
 Davis, supra,
 
 at page 558, this legislative power included the power to determine what institutions or property should be exempted from taxation. The question is not whether Section 2 of Article XII of the Constitution delegates power to the General Assembly to determine tax exemptions but rather whether anything therein can be construed as a limitation upon such power otherwise delegated by the people to the General Assembly by Section 1 of Article II of the Constitution.
 

 In arguing that the General Assembly does not have the same power in determining exemptions from taxation of real property as it does in determining exemptions from taxation of personal property, the majority contends that that conclusion is “established” by previous cases decided by this court. However, none of the
 
 decisions
 
 in the cases referred to justify or support that contention.
 

 In
 
 Ursuline Academy of Cleveland
 
 v.
 
 Board of Tax Appeals,
 
 141 Ohio St., 563, 49 N. E. (2d), 674, it was held unnecessary to decide the question because the General Assembly had not acted, as in
 
 State, ex rel. Struble,
 
 v.
 
 Davis, supra,
 
 after this amendment to the Constitution had been adopted in 1929 (see paragraphs three, four and five of the syllabus and the opinion, pages 570 and 571). The court held that, in the absence of such legislative action, the statute involved should be given the construction which had been given to it by this court in order to sustain its validity under the constitutional provisions in force prior to 1929.
 

 However, Section 5351, General Code, involved in the instant case, was substantially amended effective in September 1943.
 
 *
 

 
 *121
 
 Most of the cases referred to by the majority, like the
 
 Ursuline Academy case,
 
 involved claims for tax exemption under statutes enacted prior to adoption of the amendment of Section 2 of Article XII of the Constitution in 1929. See
 
 City of Toledo
 
 v.
 
 Jenkins et al., Board of Tax Appeals,
 
 143 Ohio St., 141, 54 N. E. (2d), 656;
 
 Federal Public Rousing Authority
 
 v.
 
 Guckenberger, Aud.,
 
 143 Ohio St., 251, 55 N. E. (2d), 265;
 
 Youngstown Metropolitan Housing Authority
 
 v.
 
 Evatt, Tax Commr.,
 
 143 Ohio St., 268, 55 N. E. (2d), 122;
 
 Pfeiffer et al., Trustees,
 
 v.
 
 Jenkins et al., Board of Tax Appeals,
 
 141 Ohio St., 66, 46 N. E. (2d), 767;
 
 Dayton Metropolitan Housing Authority
 
 v.
 
 Evatt, Tax Commr.,
 
 143 Ohio St., 10, 53 N. E. (2d), 896;
 
 Columbus Metropolitan Housing Authority
 
 v.
 
 Thatcher, Aud.,
 
 140 Ohio St., 38, 42 N. E. (2d), 437;
 
 Cullitan, Pros. Atty.,
 
 v.
 
 Cunningham Sanitarium,
 
 134 Ohio St., 99, 16 N. E. (2d), 205.
 

 In
 
 Zangerle, Aud.,
 
 v.
 
 City of Cleveland, Division of Municipal Transportation,
 
 145 Ohio St., 347, 61 N. E. (2d), 720, the holding of the court was that the use of the property was not for a “public purpose” and, therefore, not within the terms of the exemption statute (page 359). In no other way could the court have reached the conclusion which it did that the personal property was taxable. It was certainly not necessary to consider whether the Constitution authorized exemptions of real property other thán those specifically provided for by statute, especially when that statute had been enacted prior to 1929.
 

 In
 
 Division of Conservation and Natural Resources
 
 v.
 
 Board of Tax Appeals,
 
 149 Ohio St., 33, 77 N. E. (2d), 242 the syllabus reads in full:
 

 “Real property owned by the state and
 
 rented
 
 by it to a private citizen, who uses it
 
 exclusively for private purposes,
 
 is not exempt from taxation under Section 5351, General Code.” (Emphasis added.)
 

 Obviously, exemption was not justified under the
 
 *122
 
 words of the statute because this was not property either
 
 “belonging exclusively to the state”
 
 (see
 
 Iroquois Co.
 
 v.
 
 Meyer,
 
 80 Ohio St., 676, 89 N. E., 90;
 
 Baltimore & Ohio Rd. Co.
 
 v.
 
 Walker,
 
 45 Ohio St., 577, 16 N. E., 475;
 
 Cooper
 
 v.
 
 Roose,
 
 151 Ohio St., 316, 85 N. E. [2d], 545) or “public property
 
 used for a public purpose.”
 

 The opinion in
 
 City of Shaker Heights
 
 v.
 
 Zangerte, Aud.,
 
 148 Ohio St., 361, 74 N. E. (2d), 318, does not discuss this question. It merely applies the decision in
 
 Zangerle, Aud.,
 
 v.
 
 City of Cleveland, supra,
 
 to substantially the same facts involved in the latter case. In
 
 New Orphans’ Asylum of Colored Children of Cincinnati
 
 v.
 
 Board of Tax Appeals,
 
 150 Ohio St., 219, 80 N. E. (2d), 761, not cited in the majority opinion but sometimes urged as having decided this question, the tax exemption sought was granted.
 

 Hospital Service Assn. of Toledo
 
 v.
 
 Evatt, Tax Commr.,
 
 144 Ohio St., 179, 57 N. E. (2d), 928, does apparently decide that the General Assembly does not have the same power to exempt real property from taxation as it does to exempt personal property. No reason is given why the words which the people used require such a result.
 

 The only reason there given for the conclusion that the General Assembly had no general power to determine exemptions from taxation of real property (opinion page 183) would require a holding that the General Assembly did not have such power to determine exemptions from taxation of personal property. However, in
 
 State, ex rel. Struble,
 
 v.
 
 Davis, supra,
 
 559, 560, that reason had been considered and rejected. As stated in the opinion in that case by Matthias, J., at page 560:
 

 “A.s amended, the Constitution itself now provides that the enumeration of certain classes of property which may be exempted does not take away or limit
 
 *123
 
 authority of the Legislature to make other exemptions. ’ ’
 

 Hospital Service
 
 Assn. v.
 
 Evatt, Tax Commr., supra,
 
 not referred to in the majority opinion, has been judicially noticed by this court only once, when it was distinguished.
 

 While, under the rule of
 
 stare decisis,
 
 any decision of this court is entitled to great respect, that rule should not be invoked to sustain a decision which appears to be clearly wrong, except where such decision has become a rule of property or the overruling of such decision would otherwise cause hardship or inconvenience to those who have relied on the decision. See
 
 State
 
 v.
 
 Sinks,
 
 42 Ohio St., 345, 357;
 
 City of Youngstown v. Fishel,
 
 89 Ohio St., 247, 251
 
 et seq.,
 
 104 N. E., 141;
 
 State, ex rel. Guilbert, Aud.,
 
 v.
 
 Yates, Aud.,
 
 66 Ohio St., 546, 548, 64 N. E., 570.
 

 As stated by Davis, J., in the opinion in the
 
 Guilbert case:
 

 “No amount of wrong adjudication can justify a practical abrogation of the Constitution. We may well pause and consider carefully when we find our views to be in conflict with those entertained by our predecessors; but if it be found that the conflict is honestly irreconcilable, there is but one course to take, and that is to follow our own convictions.”
 

 Furthermore, in
 
 Board of Education of City School Dist. of City of Cincinnati
 
 v.
 
 Board of Tax Appeals,
 
 149 Ohio St., 564, 80 N. E. (2d), 156, this court necessarily held that the General Assembly has the same power to exempt real property from taxation as it does to exempt personal property from taxation.
 

 To hold that the General Assembly does not have the same power to exempt real property, as this court has held that, it does to exempt personal property from taxation, it is necessary to decide that, when the people recognized “the general power” of the General As
 
 *124
 
 sembly subject to tbe Bill of Rights in Article 1 “to determine the subjects and methods of taxation or exemptions therefrom,” the people intended the words “of personal property” or “of property other than real property” to appear after the word “taxation.” The people did not use those additional words. Nothing which the people did say will justify any reasonable inference that they intended to so limit the words which they used.
 

 If the words of the Constitution are to be changed, that should be done by the people and not by judicial construction. An invasion of the rights and powers of the people in the making of their Constitution, under the guise of judicial interpretation, necessarily impairs and undermines public confidence in the administration of justice. .
 

 On this question my conclusions are:
 

 1. Under the amendment of Article XII, Section 2 of the Constitution, adopted in 1929, the General Assembly has the same power to determine exemptions from taxation of real property as it does to determine exemptions from taxation of personal property.
 

 2. That power is limited only by the provisions of Article I of the Constitution.
 

 The next question to be considered is whether Section 5351, General Code, as amended to take effect in September 1943 and now in force, requires a different conclusion than that reached by a majority of this court in
 
 Zangerle, Aud.,
 
 v.
 
 City of Cleveland, supra,
 
 with regard to exemption from taxation of public property used for a public purpose where the public purpose is such as to be characterized as a proprietary one.
 

 The writer of this opinion has never been able to understand why public purposes of a proprietary nature are not still public purposes. Even in 1851, they were so regarded (see
 
 Cincinnati, W. & Z. Rd. Co. v.
 
 
 *125
 

 Commrs. of Clinton County,
 
 1 Ohio St., 77, 94 to 96, and
 
 Giesey
 
 v.
 
 Cincinnati, W. & Z. Rd. Co.,
 
 4 Ohio St., 308, 323 to 325); and, as pointed out by Zimmerman, J., in his dissenting opinion in
 
 Zangerle, Aud.,
 
 v.
 
 City of Cleveland, supra,
 
 the words “public purpose” in Section 2, Article XII, had been previously held by this court to include public purposes of a proprietary nature. There is no language in the Constitution of Ohio which might be interpreted as requiring a limitation of the words “public purpose” in Section 2, Article XII to those of a governmental as distinguished from a proprietary nature.
 

 In
 
 State, ex rel. Williams,
 
 v.
 
 Glander, Tax Commr.,
 
 148 Ohio St., 188, 201, 74 N. E. (2d), 82, the following was quoted with approval in the majority opinion by Turner, J., from 51 American Jurisprudence, 550, Section 557:
 

 “When public property is involved, exemption is the rule and taxation the exception. Public property is presumed to be exempt from the operation of general property tax laws. Tax statutes are construed not to embrace property of the government or its instrumentalities unless the legislative intention to include such property is plainly and clearly expressed. ’ ’
 

 The basis for such conclusions is the recognition of the absurdity of government levying taxes against itself to pay taxes to itself. Taxation of publicly owned property would obviously involve the levy of other taxes to pay any levy of taxes on such public property. Thus, the exemption of publicly owned property from taxation, unlike other tax exemptions, does not, in effect, usually involve any additional burden on other taxpayers.
 

 Section 5351, Genéral Code, as now in force, clearly discloses the intention of the General Assembly not to limit the words “public purpose” to those of a govern
 
 *126
 
 mental nature. This section is quoted in full in the majority opinion and will not be repeated here.
 

 The first sentence states broadly that “public property used for a public purpose, shall be exempt from taxation.” The second sentence deals only with the exemption of property owned by an adjoining state or one of its subdivisions or agencies. It significantly provides for exemptions of such property only “when devoted to public use and not held for pecuniary profit.” It would necessarily seem to follow that the General Assembly intended to exempt other public property, such as involved in this case, if used for a public purpose, even if it was held for pecuniary profit. Thus, the'General Assembly has provided for the abrogation of the rule of law announced and applied in
 
 Zangerle, Aud.,
 
 v.
 
 City of Cleveland, supra.
 

 The next question to be considered is which, if any, of the parcels of real property involved in the instant case were “used for a public purpose.” It is conceded that all were public property.
 

 I agree with the majority that parking lots 3 and 4 were not so used and were not, therefore, exempted from taxation.
 

 I believe that the decision of this court in
 
 City of Cleveland
 
 v.
 
 Ruple,
 
 130 Ohio St., 465, 200 N. E., 507, requires the conclusion that parking lots numbered 1 and 2 were used for public purposes. The 35-cent charge for parking was a reasonable one. The dollar amount from the 11 or 12 per cent, allowed to those who operated these lots on the 100 days a year when they were not available to the public for parking without charge, amounted to no more than reasonable compensation for the responsibility involved. It follows that these lots were exempted from taxation under the provisions of Section 5351, General Code.
 

 If an “exclusive” use for public purposes were necessary for tax exemption, I would be inclined to
 
 *127
 
 agree that the stadium was not exempted. However, it seems to me that it would be most unreasonable to determine, on the facts presented to the Board of Tax Appeals, that the stadium was not “used for a public purpose” within the meaning of Section 5351, General Code.
 

 In
 
 State
 
 v.
 
 City of
 
 Columbia, 115 S. C., 108, 104 S. E., 337, it is said in the court’s opinion by Hydrick, J.:
 

 “The city hall of Columbia * * * contains also what is known as the City Opera House, or Columbia Theater. The city council has always leased the theater to private persons, who have procured theatrical, musical, and other entertainments, to which the public have been admitted on payment of reasonable charges. The city council has always exercised the right of supervision, so as to prevent any exhibition or performance against good morals, and also the right to use the auditorium for public gatherings of a religious, charitable, educational, industrial, social or political nature; and it has been so used on many such occasions without charge, except the actual cost of opening, heating, and lighting it. The record of the city council shows that the theater was built in the city hall, because private capital could not be induced to build one; and, from the foundation of the city, there has been no other, place in the city where such public entertainments could be given, or such public gatherings be held.
 

 “The state does not and cannot well contend that the city hall has not been used exclusively for public purposes. Good theatrical and musical performances educate, enlighten, and afford pleasurable entertainment to the people which makes them better citizens. The authorities generally agree that the providing of public parks and playgrounds is a public purpose for which public funds may be expended.
 

 
 *128
 
 “We see no reason to differentiate the providing of a place where public entertainments may be given and public gatherings be held for the benefit of adults, who are only ‘children of a larger growth.’ The question was incidentally involved and decided in
 
 Jones
 
 v.
 
 Camden,
 
 44 S. C., 319, 23 S. E., 141, 51 Am. St. Rep., 819, where it was held that the fact that the ‘town hall’ contains a store and an ‘opera house,’ from the rentals of which some revenue was derived, did not deprive the building of its character as a public building, erected and used for municipal purposes. We have no difficulty, therefore, in reaching the conclusion that the city hall has been ‘used exclusively for public purposes
 

 In
 
 Green
 
 v.
 
 Garrett
 
 (Md.), 63 A. (2d), 326, it is said in the court’s opinion by Marbury, C. J.:
 

 “The appellant’s first contention is that the Department of Recreation and Parks has no power or authority to enter into an agreement with the baseball company, giving the latter the privilege of using the stadium for professional baseball.
 

 ‘ ‘ The Baltimore Stadium was constructed as a sports center to be used for all purposes for which such a building could be used. It has been, since its construction, the scene of many athletic events. * * * In its very earliest days it was used for professional football games, and it is now being used during the football season by the Baltimore professional football team. Many of the great college football teams of the country have played there. It is obvious that it was never intended that the athletic and recreational facilities which the department is allowed to conduct there, should be those only in which residents of the city were physically engaged. Recreation is a broad term, and it would be an unnatural use of it to say that it does not
 
 *129
 
 apply to watching a football or baseball game, but only applied to engaging in one. From the onlooker’s point of view, a game conducted by professionals is often more interesting than one played by amateurs. The very purpose of a stadium is to afford facilities for spectators. The players need only the ground to play upon.
 

 “Watching games of baseball, and particularly a game of professional baseball, is to many people in this country the greatest possible recreation with respect to athletic activity. We think the department has ample power to recognize this, to provide such recreation, and to enter into a long term lease if it and the board of estimates think it advisable, and for the interest of the city and of its people to do so
 
 *
 
 * *. In our opinion, the wording of the chapter gives the department a wide discretion to determine what are athletic and recreational facilities, and it has ample power to include professional baseball as part of the facilities at this location. This is a use for the benefit of the public, and comes within the scope of the charter provision. ’ ’
 

 In
 
 Martin
 
 v.
 
 City of Asbury Park,
 
 114 N. J. Law, 298, 176 A., 172, it is said in the court’s opinion by Wells, J.:
 

 “The land levied upon has been leased by the defendant to one Edward T. Mitchell for the purpose of maintaining thereon a bathing establishment previously erected by the defendant city. The injuries for which the judgment was given were sustained by Mrs. Martin while a patron of this bathing establishment.
 

 “ * * * there is authority, both statute and case, that property held by a municipal corporation for private and proprietary purposes can be taken in execution
 
 *130
 
 upon a judgment entered against such corporation.
 

 “The pertinent question, therefore, is as to the status of the land taken under the levy here contested.
 

 “The unique position of our seashore resorts enables them to extend certain benefits of the ocean and beach to persons who come from many sections of this and other states. It may well be said that the functions of a municipality so situated include the supervision and development of these special advantages. With such a view, the Legislature specifically provided that the public lands purchased under the authority of the above act should be so improved and developed that the funds necessary to the purchase should eventually be contributed by the public so benefited; but a condition was imposed, that the income thus derived from the public must be applied to the maintenance of these public lands from which the benefit is derived. The conclusion is inevitable that the plan of purchase, leasing, providing of bathing pavilions, etc., are all various units of the one ‘public purpose.’ ”
 

 In
 
 Myer
 
 v.
 
 City of Cleveland,
 
 35 Ohio App., 20, 171 N. E., 606 (motion to certify overruled, xiviii), which held that the Cleveland stadium was a public building which could be constructed and maintained by the city, it is said in the court’s opinion (page 27) by Williams, J., later a member of this court:
 

 “Whether it can be used for professional baseball we are not compelled to determine at this time, but public auditoriums and public assembly places owned by municipalities have commonly been let for a consideration for lawful purposes, and where buildings of that character are owned by the city there can certainly be no objection to the city deriving revenue therefrom. ”
 

 This court has recognized that public property may
 
 *131
 
 be used for a public purpose even though part of its use may be for private purposes. Thus, in
 
 Little Miami Elevator Co.
 
 v.
 
 City of Cincinnati,
 
 30 Ohio St., 629, paragraph three of the syllabus reads:
 

 “The right to surplus water and to lease the same for private uses, is an incident of the public use of the canal for purposes of navigation. The canals of the state were authorized, constructed, and maintained for public purposes, and not to afford water power, to be leased or sold, for private use. The latter use is subordinate, and the right to the same may be terminated whenever the state, in the exercise of its discretion, abandons or relinquishes the public use.”
 

 In
 
 Pontiac Improvement Co.
 
 v.
 
 Board of Commrs. of Cleveland Metropolitan Park Dist.,
 
 104 Ohio St., 447, 465, 135 N. E., 635, 23 A. L. R., 866, it is stated in the court’s opinion by Johnson, J.:
 

 “No one would contend that it is not proper to expend public money in the acquisition, care and adornment of public parks. They contribute to the mental as well as to the physical improvement of the people, and their aesthetic value in large commercial and industrial centers is very great.”
 

 In a large city the opportunities for open-air athletics are limited and yet the need therefor is greater than in less congested communities. That need is of the same nature as the need that results in a city providing public parks for its citizens. In this country, baseball and football are national pastimes and a great source of public relaxation and entertainment. No one will question the extent of the public interest in the activities of the Cleveland professional baseball and football teams.
 

 The construction and operation of modern open-air stadiums have not been developments of private enterprise. They originated in the athletic needs of schools and colleges and have been undertaken generally as
 
 *132
 
 municipal functions throughout the country.- Even if the development and operation of such an enterprise were left to private initiative, it would require so much governmental policing and regulation that such policing and regulation alone might represent the largest part of its operation. To best answer public needs, such an enterprise should be as near the center of the city as possible. Crowds running up to 85,000 cannot be safely handled in the center of a large city except by public authority. Order must be maintained inside and outside the building. These traffic and police problems and the public evils that might arise from sale of intoxicating liquors and from gambling, if the enterprise were not conducted as a public enterprise, are important factors which justify the conduct of such enterprise at all times under governmental supervision.
 

 In my opinion, therefore, the stadium was “used for a public purpose” within the meaning of Section 5351, General Code, and the decision of the Board of Tax Appeals to the contrary was both unreasonable and unlawful.
 

 The majority opinion states that demands for exemptions from taxation are increasing. The instant case is a good example of the reason for that increase. No one ever seriously considered the possibility that the stadium was not exempt from taxation until recent decisions by this court raised doubts about rights to exemptions which had been generally recognized for decades. The necessity of demanding these exemptions does not stem, from efforts to extend any limitation upon exemptions that were recognized before those decisions.
 

 Stewart, J., concurs in the foregoing dissenting opinion.
 

 *
 

 It may be noted that the provisions of Section 5356, General Code (108 Ohio Laws, pt. 2, 1285), were enacted prior to 1929.